## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 25 2018, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel Hageman
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nikolas Shannon,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | October 25, 2018<br><br>Court of Appeals Case No.<br>18A-CR-935<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Clayton A. Graham, Judge<br><br>Trial Court Cause No.<br>49G07-1701-CM-3064 |

**Brown, Judge.**

[1] Nikolas Shannon appeals his conviction for resisting law enforcement as a class A misdemeanor. We affirm.

## *Facts and Procedural History*

[2] On January 20, 2017, Indianapolis Metropolitan Police Officers Nathan Shell and Katie De Leon were dispatched to an apartment in Indianapolis in response to 911 calls. The woman who called 911 had called twice while crying and hung up both times. Officer Shell arrived at the apartment building, noticed two young children in an unattended vehicle which was parked directly across from the stairs to the apartment building entrance, and walked up to the apartment. Officer De Leon arrived at the scene, and Officer Shell directed her attention to the unattended vehicle. Officer De Leon heard the children crying and could see and smell cigarette smoke. Officer Shell knocked on the apartment door, Ahni Cottrell answered, and Officer Shell observed that Cottrell appeared "panicked" and "frightened, alerting [him] that maybe something was happening to her or had happened to her or near her that put her on alert." Transcript Volume II at 107. Officer De Leon ran the license plate on the vehicle and the information provided by the control operator for the plate did not match the vehicle.

[3] Approximately three to four minutes after she arrived at the scene, Officer De Leon saw Shannon approaching her at a hurried place, and he was coming from the staircase just below Officer Shell. Shannon explained to Officer De Leon that he had left the children for only one minute and forty-five seconds and handed her his driver's license. Officer De Leon observed that Shannon

seemed panicked, that his speech was rapid, and that he was using a lot of hand motions. Officer Shell finished speaking with Cottrell and went to assist Officer De Leon. Officer De Leon input information for Shannon into her laptop and discovered a protective order in which Shannon was the protected person from Cottrell, and Officer De Leon input Cottrell's information and discovered an order protecting her from Shannon. Officer DeLeon input information for Shannon into her laptop and discovered a protective order in which Shannon was the protected person from Cottrell, and Officer DeLeon input Cottrell's information and discovered an order protecting her from Shannon. Shannon was placed in handcuffs.

[4] As part of standard operating procedure, Officer De Leon used her radio to contact her control operator to confirm the protective order between Shannon and Cottrell.[1] The operator told Officer De Leon that there was a protective order between the two and that it had not been served. Once the officers received that information, they removed the handcuffs. Shannon then told Officer De Leon that he knew about the protective order and it had been in place for two years but that he just did not understand the rules of the order. **(73)** Officer De Leon pulled the protective order up on her laptop screen and read over the protective order with Shannon to let him know the rules or parameters which were set by the judge, and as she was doing so Shannon kept

---

[1] Officer De Leon testified: "It's just a standard operating procedure that we do for protection orders because they don't tell us if they've been served or if they're – sometimes they don't tell us if they're expired or if they're active. So it's just something we do to double-check." Transcript Volume II at 68.

telling her "that he didn't understand the rules of the protection order because he knew it had been in place for two years." *Id*. at 74.

[5] Officer De Leon sent a message using her laptop to her control operator asking the operator to double-check whether the protective order had been served because Shannon was stating that he already knew about it. Officer De Leon received a message from the control operator which indicated that the protective order became effective on March 8, 2016, and expired on March 8, 2018, and stated "so yeah its [sic] good still." State's Exhibit 8. Officer De Leon interpreted the message to mean that the protective order had been served and thought that, if it had not been served, "it would not be good." Transcript Volume II at 78. Officer De Leon informed Officer Shell that the protective order "was good per the message that [she] got back from [the] control operator." *Id*.

[6] At that time, Shannon was on a telephone call with his mother. The officers told Shannon that they needed to place him in handcuffs and to place his hands behind his back, but he ignored them. They told Shannon that he could stay on the phone with his mother but that they needed to handcuff him. This went on for about three to five minutes. According to Officer Shell, the officers told Shannon that they were going to place him back in handcuffs "[i]n a very gentle manner because [he] understood that [the officers] had just taken him out," that he calmly told Shannon that the officers needed to place him back into custody, and that he used "[a] deliberately slower tone, just so that way he could understand the words and that there was some sincerity in that [Officer Shell]

was not yelling at Mr. Shannon." *Id.* at 117. At some point, Shannon became louder with the officers, and Officer De Leon heard Shannon "screaming into the phone to his mother that the police were killing him" and that he "repeated that multiple times, although at that point neither of the officers had their hands on [him] at all." *Id.* at 80. Officer Shell put one hand on Shannon's right arm and the other hand around Shannon's wrist, and another officer mirrored the same posture on Shannon's left arm. The officers informed Shannon that they needed him to go down to the ground, Shannon eventually went to his knees, and the officers told him they needed to place him on the ground and in handcuffs.

[7] After being asked many times, Shannon eventually went to the ground. He was on his stomach, had his arms out in front of him, and was still holding onto his phone and talking to family members. Officer Shell was on Shannon's right side, was "still providing weighted leverage," and was "applying reasonable weight to his arm to keep . . . his right arm under control," and the other officer was "mirroring that same posture on [Shannon's] left side." *Id.* at 120. Officer Shell "just used [his] hands to apply weighted leverage and then leaned on that while [he] talked to [Shannon], say hey, sir, we just need you to put your hands behind your back." *Id.* at 121. Shannon "ripped his hand" away. *Id.* Officer Shell then informed Shannon "a little bit more deliberately" that he needed to take him into custody and that he needed him to place his hand behind his back. *Id.* at 123. Shannon was "[a]gitated" and would not voluntarily place his

hands behind his back as requested and would not hold still, and weighted leverage was necessary to keep him under control. *Id*.

[8] Officer Shell gave Shannon a warning that, if he did not place his hands behind his back, necessary force would be applied to move his hands behind his back. Shannon did not comply. Officer Shell applied "one knee strike" to Shannon's rib area, the officers then "assessed the situation, took a deliberate pause" to observe whether Shannon was in pain, and Shannon did not complain of pain from the strike, was still talking to his mother, did not comply with the officers' orders, and was even more agitated. *Id*. at 125. The officers gave him another warning, "[t]hen a second knee strike was administered, which did work," no further strikes were administered, and Shannon was placed in handcuffs without further incident. *Id*. at 126.

[9] On January 23, 2017, the State charged Shannon with resisting law enforcement as a class A misdemeanor. Shannon filed a motion to suppress, and following a hearing the court denied the motion. A jury trial was held at which Officers Shell and De Leon testified. Officer Shell testified that he is trained to use necessary force, which "means starting with verbal, then escalating if necessary to hand, the weighted leverage, and then going up there to strikes if needed, and then to take OC spray or Taser, and then from there to less lethal . . . and then if necessary with lethal . . . ." *Id*. at 124. The jury found Shannon guilty as charged. The court sentenced Shannon to 365 days incarceration with 275 days suspended.

## *Discussion*

[10] Shannon claims the police officers used excessive force and thus were not lawfully engaged in their duties. He argues the facts did not give rise to probable cause that he had committed invasion of privacy, he did not pose an immediate threat to the safety of the officers or others, and he was not actively resisting or attempting to flee the scene. He further argues the evidence does not show that he forcibly resisted law enforcement. The State maintains that the evidence establishes that the officers were lawfully engaged in the execution of their duties, did not use excessive force, acted objectively reasonably, and had probable cause to arrest Shannon. It also argues the evidence shows that Shannon forcibly resisted and ripped his arm away from Officer Shell.

[11] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id*.

[12] Ind. Code § 35-44.1-3-1 provides in part that a person who knowingly or intentionally forcibly resists, obstructs, or interferes with a law enforcement officer while the officer is lawfully engaged in the execution of the officer's duties commits resisting law enforcement as a class A misdemeanor. The State's charging information alleged that Shannon did knowingly forcibly resist,

obstruct or interfere with Nathan Shell, a law enforcement officer, while he was lawfully engaged in his duties as a law enforcement officer.

[13]     In *Love v. State*, the Indiana Supreme Court held:

> An officer is not lawfully engaged in the execution of his duties when he uses unconstitutionally excessive force. Claims that law enforcement officers have used excessive force in the course of an arrest of a free citizen are analyzed under the Fourth Amendment to the United States Constitution and its "reasonableness" standard. The "reasonableness" inquiry in an excessive force case is an objective one; the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

73 N.E.3d 693, 697 (Ind. 2017) (citations omitted).

[14]     In addition, with respect to the term "forcibly" in Ind. Code § 35-44.1-3-1, the Indiana Supreme Court in *Spangler v. State* held that the word "forcibly" meant "something more than mere action." 607 N.E.2d 720, 724 (Ind. 1993). It held that "one 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade a law enforcement official's rightful exercise of his or her duties." *Id.* at 723. "[A]ny action to resist must be done with force in order to violate this statute. It is error as a matter of law to conclude that 'forcibly resists' includes all actions that are not passive." *Id.* at 724.

[15]     "But even so, the statute does not demand complete passivity." *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013) (citation omitted). In *Graham v. State*, the Court clarified that "[t]he force involved need not rise to the level of mayhem."

903 N.E.2d 963, 965 (Ind. 2009). "In fact, even a very 'modest level of resistance' might support the offense." *Walker*, 998 N.E.2d at 727 (quoting *Graham*, 903 N.E.2d at 966 ("even 'stiffening' of one's arms when an officer grabs hold to position them for cuffing would suffice")). The Indiana Supreme Court held:

> So in summary, not every passive—or even active—response to a police officer constitutes the offense of resisting law enforcement, even when that response compels the officer to use force. Instead, a person "forcibly" resists, obstructs, or interferes with a police officer when he or she uses strong, powerful, violent means to impede an officer in the lawful execution of his or her duties. But this should not be understood as requiring an overwhelming or extreme level of force. The element may be satisfied with even a modest exertion of strength, power, or violence. Moreover, the statute does not require commission of a battery on the officer or actual physical contact—whether initiated by the officer or the defendant. It also contemplates punishment for the active *threat* of such strength, power, or violence when that threat impedes the officer's ability to lawfully execute his or her duties.

*Id.*

[16] We observe that a person commits the offense of invasion of privacy if the person knowingly or intentionally violates a protective order. *See* Ind. Code § 35-46-1-15.1. The Indiana Supreme Court has held that probable cause to support an arrest exists when the officer has knowledge of facts and circumstances that would warrant a person of reasonable caution to believe that

the suspect committed a criminal act. *See Griffith v. State*, 788 N.E.2d 835, 840 (Ind. 2003).

[17] The record reveals that Officers Shell and De Leon responded to Cottrell's apartment following two 911 calls, that upon arriving at the apartment Officer Shell observed that Cottrell appeared frightened, and that Shannon approached Officer De Leon from the staircase. While the operator initially reported that the protective order had not been served on Shannon, Shannon indicated that he knew about the order and, after Officer De Leon asked the operator to verify whether the order had been served, the operator informed Officer De Leon that the protective order was "good still," which Officer De Leon interpreted to mean that the order had been served. State's Exhibit 8. The record further reveals that, when the officers informed Shannon that they needed to place him in handcuffs, Shannon ignored them. Shannon became loud and screamed into the phone, the officers held Shannon by the arms and told him to move to the ground, and after being asked many times Shannon eventually did so. On the ground, Officer Shell applied weighted leverage to Shannon, and Shannon was agitated and ripped his hand away from Officer Shell. Officer Shell gave Shannon a warning, and Shannon did not comply with the officers' verbal commands or respond to the applied weighted leverage. Officer Shell applied a knee strike and then deliberately paused to observe whether Shannon was in pain, Shannon did not complain of pain from the strike and was still talking to his mother, the officers gave Shannon another warning and applied a second knee strike, and Shannon was placed in handcuffs.

[18] Based upon the record, we conclude that evidence of probative value was admitted from which a reasonable trier of fact could find that Shannon exercised at least a modest exertion of strength, power, or violence that impeded Officer Shell in the execution of his duties and that Officer Shell was lawfully engaged in the execution of his duties at that time. *See Lopez v. State*, 926 N.E.2d 1090, 1093-1094 (Ind. Ct. App. 2010) (holding the evidence was sufficient to show the defendant acted with the requisite force in resisting the officers where the defendant refused to stand to be cuffed and "started to pull away" when the officers tried to physically pull him up from the couch and where the officers attempted to place his arms behind his back and were unable to do so), *trans. denied*; *Johnson v. State*, 833 N.E.2d 516, 518-519 (Ind. Ct. App. 2005) (finding the defendant resisted officers by turning away and pushing away with his shoulders as they attempted to search him and refusing to enter the transport vehicle and stiffening up requiring that the officers exert force to place him inside the transport vehicle).

[19] For the foregoing reasons, we affirm Shannon's conviction for resisting law enforcement as a class A misdemeanor.

[20] Affirmed.

Altice, J., and Tavitas, J., conur.